## IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| **RICHARD C. POE, II, individually and derivatively for DICK POE MOTORS, LP, and DICK POE DODGE, LP,** | **Civil No.**_____ |
| **Plaintiffs**, | **Jury Trial:  Yes** |
| **v.** | |
| **FCA US LLC,** | |
| **Defendant**. | |

## COMPLAINT

Richard C. Poe, II, individually and derivatively on behalf of Dick Poe Motors, LP, and Dick Poe Dodge, LP (collectively "Plaintiffs"), by and through their attorneys, Brewer, Attorneys & Counselors, allege on personal knowledge as to own conduct, and upon information and belief as to all others, as follows:

## I. PRELIMINARY STATEMENT

1.     Richard C. Poe, II ("Richard") is a would-be fourth-generation Chrysler dealer in a family that has been in the Chrysler franchise business for nearly one hundred (100) years. Richard, through Poe Management, Inc., owns an interest in the oldest Chrysler dealership in Texas and one of the oldest Chrysler dealerships in the United States. This lawsuit follows a betrayal of that historic business relationship between the Poe family and Chrysler. It is now known that Chrysler

1

joined a conspiracy among multiple third-party tortfeasors who sought to damage Richard professionally and to illegally prevent Richard from control over his own dealerships.

## II. THE PARTIES

### A.  Plaintiffs

2.     Richard C. Poe, II is a citizen of Texas and resident of El Paso County, Texas.  Richard was the sole shareholder of Poe Management, Inc. ("PMI"), which is the General Partner of the two Limited Partnership plaintiffs that are the owners of Poe family car dealerships and other businesses in El Paso, Texas; specifically, PMI is the general partner of Dick Poe Motors, L.P. ("Motors Dealership") and Dick Poe Dodge, L.P. ("Dodge Dealership"), collectively (the "Dealerships").

3.     Dick Poe Motors, L.P. is a Texas limited partnership that owns the Dick Poe Chrysler/Jeep dealership located in El Paso County, Texas. For diversity purposes, Dick Poe Motors, L.P. is a citizen of Texas because it is a Texas company and each of its general and limited partners is also a citizen of Texas.

4.     Dick Poe Dodge, L.P. is a Texas limited partnership that owns the Dick Poe Dodge/Ram dealership located in El Paso County, Texas. For diversity purposes, Dick Poe Dodge, L.P. is a citizen of Texas because it is a Texas company and each of its general and limited partners is also a citizen of Texas.

4851-3317-2210.1

**B.**   **Defendant**

5.     Defendant is a worldwide automotive designer, manufacturer, and retailer; it operates in the United States through its wholly-owned subsidiary—FCA US LLC[1] (hereinafter "FCA US" or "Chrysler")—which was formerly known as Chrysler Group LLC, and Chrysler Corporation.  Chrysler has long been recognized as one of the "big three" automakers in the United States, along with Ford and General Motors.

### III. JURISDICTION AND VENUE

6.     This Court has subject matter jurisdiction by virtue of 28 U.S.C. §1332. The amount in controversy at issue herein exceeds $75,000 and the parties are diverse, being citizens of Texas and Michigan.

7.     This Court has personal jurisdiction over the Defendant because Defendant's principal place of business is located in the Eastern District of Michigan (the "District")—because Chrysler's executive offices are located in Auburn Hills, Michigan, which is within the District.  Additionally, Defendant has purposefully

---

[1] For diversity purposes, the citizenship of an LLC is determined by the citizenship of its members. *Delay v. Rosenthal Collins Grp., LLC*, 585 F.3d 1003, 1005 (6th Cir. 2009).  FCA US LLC is a diverse defendant because its sole member is FCA North America Holdings LLC ("FCA NAH").  FCA NAH's sole member is Stellantis N.V., which is the successor entity from the merger of the former sole member Fiat Chrysler Automobiles N.V. ("FCA N.V."), a citizen of the Netherlands and the United Kingdom, and PSA Group, a citizen of France.

4851-3317-2210.1

availed itself of the privilege of doing business within the District and maintains continuous and systematic contacts with the District.

8.     Venue is proper in the District in accordance with 28 U.S.C. §1391 because the District is the judicial district in which "any defendant resides," and all defendants are residents of Michigan—the State in which the District is located.

## IV. <u>APPLICABLE LAW</u>

9.     Because this is a federal lawsuit based on diversity jurisdiction, state substantive law is applicable to this case.[2]

10.     The law of the State of Texas applies with respect to the tort claims hereinbelow because the Dealerships at issue, and a substantial portion of the events giving rise to said causes of action, occurred in Texas.

## V. <u>RELEVANT NON-PARTIES</u>

11.     Anthony E. Bock ("Bock") is a Certified Public Accountant ("CPA") and has served as Richard's father, Dick Poe's ("Mr. Poe"), and Richard's CPA for both personal and business needs for many years.  Bock abused his fiduciary relationship and access to Richard's businesses by joining a conspiracy with the aim to damage Richard's business and remove him from dominion and control over his own Dealerships, and control over all related chattels and assets owned by said businesses.

---

[2] *See generally Erie Railroad Co. v. Tompkins*, 304 U.S. 64 (1938).

4

12.     Karen G. Castro ("Castro") served as a long-time personal assistant for Mr. Poe, and later as the comptroller for the Dealerships.  Castro abused her access and relationship with Mr. Poe as part of a conspiracy to remove Richard from dominion and control over his own Dealerships, and control over all related chattels and assets owned by said businesses.

13.     Paul O. Sergent, Jr. ("Sergent") is the principal of Sergent Law Firm, PC.  Sergent represented Mr. Poe and Poe businesses for several years and was also hired to serve as the corporate secretary for PMI. Sergent had a fiduciary relationship with Richard and abused that relationship as part of a conspiracy to remove Richard from dominion and control over his own Dealerships, and control over all related chattels and assets owned by said businesses.

14.     Gery A. Reckelbus ("Reckelbus") is an individual hired by Bock, Castro, and/or Sergent as a manager for the Dealerships, whom Chrysler arbitrarily and unlawfully approved as the new dealer principal for the Dealerships in violation of Richard's rights.

15.     The above relevant non-parties ("Relevant Non-Parties") or "RNPs," acting in concert, have engaged in a civil conspiracy (the "Conspiracy") with the unlawful aim of damaging Richard's business and exercising dominion and control over the management of the Chrysler dealerships owned by PMI in a manner inconsistent with his rights, for their own benefit.

4851-3317-2210.1

16.     The RNPs communicated with Chrysler, through Theresa McDaniel[3] and other employees, and persuaded Chrysler to join in their unlawful Conspiracy.

17.     In this Action, Plaintiffs choose to sue Chrysler,[4] whose participation in the conspiracy was as shocking as it was destructive.  Because conspirators are jointly and severally liable for the actions of all of their co-conspirators,[5] Chrysler is liable for any tortious conduct engaged in by the Relevant Non-Parties, including their tortious acts that took place before Chrysler joined their Conspiracy.

---

[3] At the time, McDaniel worked as a dealer placement manager for FCA.

[4] *See, e.g., Dussouy v. Gulf Coast Inv. Corp.,* 660 F.2d 594, 600 n. 4 (5th Cir.1981) ("[He] alleges a conspiracy but sues only one conspirator, which he is free to do."). *See also generally* 16 AM.JUR.2D CONSPIRACY § 66 ("Under the principle of joint and several liability, all conspirators may be joined as parties defendant in the action, but it is not necessary, in order for one member of civil conspiracy to be liable, that all members of conspiracy be named defendants or be joined as defendants; the plaintiff, at his or her option, may maintain suit against any one or more of them.").

[5] *See, e.g., Energy Maintenance Servs. Grp. I, LLC v. Sandt,* 401 S.W.3d 204, (Tex.App.-Houston [14th Dist.] 2012, no pet.) ("A finding of civil conspiracy imposes joint and several liability on all conspirators for actual damages resulting from acts in furtherance of the conspiracy."); *JSC Neftegas–Impex v. Citibank, N.A.,* 365 S.W.3d 387, 423–24 (Tex App.Houston [1st Dist.] 2011, pet. denied).

4851-3317-2210.1

## VI. <u>FACTUAL BACKGROUND</u>

**A.**     <u>Richard Is The Fourth Generation Of Poe Family Car Dealers.</u>

18.     Since 1928, when Richard's great grandfather A.B. Poe opened what is now the oldest Chrysler dealership in Texas, the Poe family has owned, managed, and developed successful car dealerships in and around El Paso, Texas.

19.     Just like his father before him, Richard grew up working in the Poe family business. Not surprisingly, it was always Mr. Poe's dream that Richard would succeed him in the Poe family business.

20.     Thus, it was no surprise when Richard, with a loan from his father, in December 1994, undertook the expansion of the Poe family business with a Honda dealership. The 26-year old Richard added El Paso Honda to the list of successful Poe-owned and operated car dealerships in El Paso. The El Paso Honda dealership remains a thriving business under Richard's direction today.

**B.**     <u>Richard Is A Highly Successful And Capable Car Dealership Manager.</u>

21.     In December 2015, Richard obtained operational control over the Dick Poe Toyota dealership, now known as Poe Toyota, in El Paso. In June 2017, he acquired 100% ownership of that dealership. Since Richard has been in charge, (Dick) Poe Toyota has achieved incredible success—including the annual ritual of setting new sales and financial performance records for a franchise that has been in business since the early 1980s!

4851-3317-2210.1

22.     By any reasonable metric, Richard is a highly successful and gifted car dealership manager.   In fact, the performance of his dealerships is unmatched throughout the State of Texas.

C.     **PMI Is Formed For The Benefit Of Richard By His Father.**

23.     In August of 2007, Richard's Father, Mr. Poe, formed PMI. Mr. Poe was 73 years old at the time.

24.     The purpose of PMI was to enable Richard's succession and continuation of the Poe family tradition.

25.     Richard, the sole shareholder of PMI, was issued 1,000 shares of PMI on share certificate #001.  No other shares were issued.

26.     After its formation, PMI became the General Partner of several Poe family limited partnerships, including Motors Dealership and Dodge Dealership (collectively, the "Poe Businesses").

27.     Mr. Poe was the sole director and president of PMI, and Richard was the vice president of PMI.  Sergent was the secretary of PMI. Importantly, Richard always remained the sole shareholder of PMI.

28.     Naturally, as long as he was alive, Mr. Poe was in control of the operation of the Poe Businesses.  After all, Mr. Poe enjoyed being in charge of those businesses.  Richard trusted Mr. Poe to manage PMI for Richard's (and the family's) benefit, and the arrangement allowed Richard to focus on other business pursuits—

4851-3317-2210.1

such as the expansion of the Poe family holdings. Richard would—and was always meant to—be in control of the Poe Businesses through PMI once Mr. Poe was ready to retire.

29.     While he was overseeing the management and operation of the Poe Businesses, including the Dealerships in El Paso, Texas, Mr. Poe employed a number of individuals.  They included:

- Bock, a certified public accountant;

- Sergent, a lawyer who provided Mr. Poe with business and legal advice in connection with the corporate and financial affairs of the Poe Businesses; and

- Castro, who assisted Mr. Poe as his long-time personal assistant and then acted as the "Comptroller" for the Dealerships.

## D.    Relevant Non-Parties Conspire To Steal Richard's Business.

30.     On May 6, 2015, ten (10) days before he died, Mr. Poe, as the sole director of PMI, purportedly caused PMI to issue 1,100 new shares in PMI to himself in exchange for $3,209,205.00.  That same day, Mr. Poe was purportedly issued share certificate #002 for those 1,100 new PMI shares (the "Illegal Share Issuance").[6]

_____

[6] On May 22, 2017, an El Paso jury determined that the share issuance violated Texas law for two reasons: (i) Mr. Poe breached fiduciary duties he owed to Richard, the sole owner, to accomplish the share issuance; and (ii) the share issuance was not saved by the so-called "safe harbor" provided by section 21.418(b) of the Texas Business Organizations Code. On November 8, 2017, a final judgment

9

31.     As a result of the Illegal Share Issuance, Mr. Poe, for the first time in PMI's existence, purportedly became a majority shareholder, while Richard became a minority shareholder.   More specifically, Mr. Poe allegedly diluted Richard's ownership interest in PMI from 100% to approximately 48% and acquired a 52% (approximately) majority ownership interest in PMI.

32.     Having conspired with the RNPs to orchestrate the events described above, on May 11, 2015, Sergent sent an email to Bock attaching a Unanimous Consent of Board of Directors of PMI in Lieu of Special Meeting dated May 1, 2015, that issued shares to Mr. Poe; as well as a copy of the check purportedly signed by Mr. Poe for that purchase and a copy of the corresponding share certificate.   During this time, Bock served as CPA for both Richard and Mr. Poe in connection with their personal and business finances.   It was not until later that Bock, citing a conflict of interest, informed Richard that he could no longer represent him.

33.     On May 16, 2015, Mr. Poe passed away.

34.     Within a mere three (3) days of Mr. Poe's death, and two (2) days before Mr. Poe's funeral, Bock and Castro directed their attorney to file an Application to

---

memorializing the jury verdict and declaring the share issuance to be invalid and unenforceable under Texas law was entered by the Probate Court Number One of El Paso County, Texas.  That judgment was affirmed by the El Paso Court of Appeals and is currently on appeal to the Texas Supreme Court.  Its enforcement is stayed pending final disposition by the Supreme Court.

Probate Will with Letters Testamentary with Probate Court Number One.  Mr. Poe's Last Will and Testament was prepared by Sergent, and names Bock and Castro as co-independent executors of Mr. Poe's Estate (the "Estate").

35.    On or about June 8, 2015, Bock and Castro were appointed as co-independent executors of the Estate by the probate court.

36.    As the executors of the Estate, and because of the Illegal Share Issuance, Bock and Castro gained unfettered control of Richard's businesses, including PMI.

37.    Bock and Castro then promptly:

- appointed themselves directors of PMI;

- elected themselves officers of PMI;

- re-elected Sergent PMI's secretary;

- paid themselves generous compensation packages;

- entirely removed Richard from functional control over PMI—and, by extension, the Dealership limited partnership entities; and

- requested—and unlawfully obtained—Chrysler's approval of Reckelbus as the new "dealer principal" for the Dealerships, all without Richard's knowledge or consent.

38.    Due to the stay preventing the enforcement of the Probate Court's judgment pending appeal, Richard continues to be denied control over PMI and, in turn, the Dealerships.

39.     Reckelbus still unlawfully serves as the "dealer principal" with Chrysler's full and continuous knowledge and approval of the same.

40.     Bock, Castro, and Sergent engaged in this and other tortious conduct, which greatly damaged Richard's Dealership businesses and resulted in losses well in excess of $75,000, as described more fully below.

**E.    Chrysler Joins The Ongoing Conspiracy.**

41.     The facts surrounding Chrysler's behavior after the Illegal Share Issuance and ongoing communications with Bock, Castro, and Sergent are such that Chrysler not only knew about the tortious and unlawful conduct (having been put on notice of the same numerous times, orally and in writing) but approved of, and actively aided, that conduct.

42.     As described below, Chrysler actively, deliberately, and surreptitiously worked together with the other conspirators and aided them with the commission of their tortious acts.    More specifically, Chrysler's acts in furtherance of the Conspiracy, and additional independent wrongful and unlawful acts, include, but are not limited to:

- Refusal to respond to correspondence from Richard and/or his attorneys;

- Refusal to meet with Richard;

- Refusal to send Richard various notices, as required by law, contractual agreements, good faith, recognized industry practices, and/or its own internal policies;

12

- Refusal to send Richard copies of key documents, and misrepresenting Richard's rights pursuant to those key documents;

- Refusal to assess Richard as a successor to the Dealerships, as required by contractual agreements, good faith, recognized industry practices, and/or its own internal policies;

- Refusal to offer Richard a new Sales and Services Agreement after the passing of Mr. Poe, as required by contractual agreements, good faith, recognized industry practices, and/or its own internal policies;

- Allowing a change in management for the two Dealership Sales and Service Agreements without Richard's knowledge and approval and contrary to the requirements of law, contractual agreements, good faith, recognized industry practices, and/or its own internal policies;

- Allowing an "amendment" in the current Sales and Service Agreement without Richard's knowledge and approval in a way that was inconsistent with Richard's rights and contrary to the requirements of law, contractual agreements, good faith, recognized industry practices, and/or its own internal policies;

- Forcibly removing Richard—an acknowledged essential person—from "substantial and continuing participation"[7] in the management of the Dealerships, contrary to law, good faith, contractual agreements, recognized industry practices, and/or its own internal policies;

- Allowing the naming of Gery Reckelbus as the supposed new "dealer principal" for the Dealerships in a completely arbitrary and shockingly rapid manner: without Richard's knowledge, and further, without going through the process of fulfilling the proper substantive and procedural requirements—including an appalling and blatant lack of evaluation of personal and financial fitness for said role;

---

[7] Referencing language in Paragraph 2 of the Dealership Sales and Service Agreements with Chrysler.

- Allowing a continuous and ongoing violation of law and its own internal policies by continuing to knowingly allow Gery Reckelbus to serve as the "dealer principal" for the Dealerships; and

- Failing to provide complete and accurate responses to discovery— including a valid subpoena—and engagement in other concealment and obfuscation behavior designed to limit Richard's access to information.

### i. *Chrysler repeatedly disregards Richard's legal rights.*

43.     At 4:59 pm on May 22, 2015, six (6) days after Mr. Poe's death, Castro sent an email to Theresa McDaniel, the Dealer Placement Manager for the Southwest Business Center FCA, thanking McDaniel for taking her call and directing McDaniel to overnight "it" to the Chrysler store to Castro's attention if the file is too big to email. McDaniel replied: "Attached are the Sales and Service Agreement **Additional Terms and Provisions.** If you need anything else please let me know." (emphasis added).

44.     The Additional Terms and Provisions document are Chrysler's form— one it maintains in its files and can unilaterally choose to update "from time to time—that was meant, by Chrysler, to apply to its Dealership agreements.

45.     Paragraph 5 of the Dealership agreements states:

"The additional terms and provisions set forth in the document entitled "Chrysler Corporation Sales and Service Agreement Additional Terms And Provisions" marked "Form 91 (C-P-D)," as may hereinafter be amended from time to time, constitute a part of this Agreement with the same force and effect as if set forth at length herein, and the term "this Agreement" includes said additional terms and provisions."

14

46.     Thus, according to Chrysler, the Additional Terms and Provisions document applies to the terms of both Dealership franchise agreements between Chrysler and Plaintiffs.

47.     Paragraph 32 of the Additional Terms and Provisions contains a provision that states, in relevant part:

> "(b) CG[8] **shall**, if DEALER has not nominated a successor under this Paragraph 32 . . . review the qualifications of any remaining person named in Paragraph 2 of this Agreement.  If any such person possesses operating qualifications satisfactory to CG and possesses or is able to acquire within a reasonable time facilities and capital necessary to qualify as a CG dealer, CG **shall** offer such person a Chrysler Group LLC Sales and Service Agreement or Term Sales and Service Agreement, as CG deems appropriate." (emphasis added).

48.     The referenced paragraph 2 of the Dealership agreements, signed by Mr. Poe in the early 2000s, specifically lists Richard's name and further states: "CC[9] has entered into this Agreement relying on the active, substantial and continuing personal participation in the management of DEALER's organization by: . . . RICHARD C. POE, II."

49.     Thus, not only was Richard recognized by Chrysler to possess the necessary qualifications to serve as a dealer but Richard's participation in

---

[8] CG stands for "Chrysler Group," a predecessor to the company currently known as FCA US LLC.

[9] CC stands for "Chrysler Corporation," a predecessor in interest to Defendant FCA US LLC.

15

management was made an express condition for the Dealership agreements.  In other words, Chrysler acknowledged that Richard was essential to the operation of the Dealerships.

50.   At the time of the email dated May 22, 2015, Chrysler knew that Richard did not have access to a copy of the Additional Terms and Provisions document—because if a copy of that document was available at the dealerships at the time, there would be no reason to mail a new copy to the Dealerships.

51.   However, despite the fact that Richard was expressly meant to be evaluated as the Dealerships' successor under the plain language of the Additional Terms and Provisions document, and was specifically listed in Paragraph 2 of the Dealership Sales and Service Agreements as one of the persons Chrysler relied upon to manage the Dealerships, Chrysler chose not to follow the terms of these documents, and its own internal procedures. Chrysler chose not to evaluate Richard as a successor. Chrysler chose not to send Richard any relevant information or inform him of his rights.  Chrysler chose not to communicate with Richard and answer his questions.  Instead, Chrysler cut Richard out of the loop and began engaging in other tortious conduct with the Relevant Non-Party conspirators.

52.   Despite sending a copy of the Additional Terms and Provisions to Castro, upon information and belief, and tellingly, no copy of the Additional Terms

4851-3317-2210.1

and Provisions was voluntarily sent to Richard by Chrysler until that documentation was subpoenaed by counsel.

53.     Chrysler took further steps to misrepresent, conceal, and obfuscate Richard's legal rights, including his rights under the Additional Terms and Provisions document. Chrysler repeatedly failed and refused to communicate with Richard; failed, on multiple occasions, to respond to voice mails and written communications from Richard and his attorneys; and repeatedly obfuscated its internal decision process and reasons (if any) for denying Richard his rightful place as the successor of the historic, nearly 100-year-old family business.

### ii.     *Chrysler intentionally acts to limit Richard's access to information.*

54.     Upon information and belief, upon a death of the dealer principal, part of the standard procedure in use by Chrysler should have been to send a so-called "Notice of Dealer Death" package containing relevant information, including, presumably, information about the process and rights going forward, to the remaining management listed in Paragraph 2.   This person should have been Richard.

55.     The Notice of Dealer Death package should have been followed with a process under Paragraph 32 of the Additional Terms and Provisions, wherein Chrysler was required to evaluate whether Richard possessed the necessary

4851-3317-2210.1

qualifications to be a successor, and, ultimately, to offer him a new Sales and Service Agreement, with him as the new dealer principal.

56.    Chrysler knew about the death of Mr. Poe on or before May 18, 2015.

57.    Instead of sending Richard the required information and initiating the succession process, Chrysler acted to limit Richard's access to information, and chose to route all future communications through Castro—an individual with no legitimate legal authority—instead.

58.    More specifically, an internal FCA email, dated May 27, 2015, from Karen Anderson[10] to Theresa McDaniel states:

> "Theresa,
>
> We need a current email address for Notice of Dealer Death packages to update downstream systems. eMail address listed is; dickpoe1@whc.net, and not valid.  Could you provide a current email address for Richard C Poe II."

59.    In the subsequent email exchange, a portion of which was redacted by FCA for unclear reasons, Theresa McDaniel then contacted Castro, who gave the new contact email for the dealership as karen@dickpoe.com.[11]

---

[10] Karen Anderson worked as the "Dealer Agreement Manager—Network Development" for FCA US.

[11] Excerpt from and email from Castro to McDaniel, dated 11:57 am, 5/28/15.

60.     In an uncovered email exchange between Bock, Castro, and Sergent, the conspirators provide the following rationale for routing future communications with Chrysler through Castro's account:

- Bock: "Can you provide them your address and ask them to use that for now?"[12]

- Castro: "Yes I can, but I do not want Chrysler or Richard thinking we are hiding anything from them. . . ."[13]

- Bock: ". . . I'm just afraid if all communications go to Richard he may not share them with us."[14]

- Castro: ". . .I have the same feeling, they also asked for the current email for the dealership."[15]

61.     Thus, the choice to route key communications through Castro was no mere accident or negligence, but a deliberate, intentional act calculated to increase the conspirators' control over Richard's Dealerships and related assets, and to simultaneously diminish the degree of Richard's dominion and control over the same, by virtue of controlling the flow of information between Chrysler and Richard.

---

[12] Excerpt from and email from Bock to Castro dated 8:16 am, 5/28/15.

[13] Excerpt from and email from Castro to Bock dated 9:05 am, 5/28/15.

[14] Excerpt from and email from Bock to Castro dated 9:14 am, 5/28/15.

[15] Excerpt from and email from Castro to Bock dated 9:17 am, 5/28/15.

62.     Tellingly, the above email exchange provides clear evidence of Chrysler's bad faith, because the above exchange took place *before* the probate court appointed Bock and Castro as co-independent executors of Mr. Poe's estate (which gave them control of PMI).  That appointment did not occur until June 8, 2015.

63.     Thus, at the time of the email exchange, Chrysler had neither the right nor legal justification to bypass Richard with respect to its communications, because the conspirators with whom they communicated had no official, court-sanctioned right to control the Dealerships.

64.     In addition to the uncovered email exchanges referenced above, there have also been multiple telephone conversations between the Relevant Non-Parties and Chrysler, as a result of which Chrysler eventually agreed to go along with the Conspiracy and to appoint replacement management for the Dealerships without Richard's knowledge or consent.

65.     Richard did not learn about the details of the latter appointments until the May 2017 probate court trial, and, in fact, is still unaware of the details relevant to the Conspiracy due to Chrysler's obfuscations, failures to communicate, and failures to make complete responses to previous discovery.

### iii.     *Chrysler allows a change in management without following proper (or, indeed, any) procedures.*

66.     After gaining control over the flow of information and getting Chrysler on board with their conspiracy, the Relevant Non-Parties proceeded to hire

20

Reckelbus as manager. In an effort to strip away Richard's control as soon as possible, Reckelbus, Bock, Sergent, and Castro then proceeded to submit paperwork to add Reckelbus as the new "dealer principal" for the Dealerships.

67. More specifically, on August 10, 2015, the RNPs mailed Chrysler a "Dealer Agreement Change Request," asking Chrysler to approve an amendment of management in the dealership agreement pertaining to the Dodge Dealership.

68. Similarly, on August 12, 2015, the RNPs mailed another request to approve an amendment of management in the dealership agreement pertaining to the Motors Dealership.

69. Both of the so-called "applications" —apparently handwritten by Reckelbus—contain glaring errors and omissions that no rational manufacturer acting in good faith could possibly have approved. This includes several questions and even entire sections—such as the critical "statement of the source of funds proposed for investment in a dealership" —simply being left blank.

70. It is not unusual to take *months* to be approved as a dealer principal for a car dealership. The process typically includes, but is not limited to:

- A background check on the applicant;

- Verifying the applicant actually has access to the funds listed under the "personal assets" section;

- Verifying the source for the above funds is from legitimate and lawful sources;

- Verifying references;

- Verifying no potential conflicts of interest exist (such as current or prior employment with Chrysler);

- Obtaining additional information in regard to any ambiguous responses; and

- Other rigorous due diligence.

71.    However, given the egregious nature of Chrysler's conduct up to that point, it is, perhaps, not surprising that Reckelbus was "approved" as the new dealer principal with respect to both dealerships by August 21, 2015—likely unprecedented nine (9) and eleven (11) day turn-around times that could not have possibly included any of the checks typically employed in such a process.

72.    The above approvals of Reckelbus go beyond mere negligence and constitute strong evidence of an intentional conspiracy with the Relevant Non-Parties to wrongfully deprive Richard of dominion and control over the Dealerships.

73.    Upon information and belief, Reckelbus continues to serve as the "dealer principal" for the Dealerships with Chrysler's full knowledge and approval of the same—which constitutes evidence of a continuous and ongoing Conspiracy to engage in an unlawful and tortious behavior with the aim of damaging Richard's interests.

74.     Upon information and belief, many other and further facts showing the existence of fraud, malice, and Civil Conspiracy exist, and are expected to come to light as discovery progresses.

### iv.     Chrysler benefits from the Conspiracy while harming Plaintiffs.

75.     Chrysler benefitted from joining the Conspiracy.  One example of such benefit includes financial benefits derived from unfair competition, as described below.

76.     A car dealership does not simply sell cars but also constitutes an assemblage of what is, functionally, multiple businesses all selling various products and services and operating under the same roof.   One such business involves insurance sales.

77.     Prior to and after the Illegal Share Issuance and subsequent events, the Dealerships offered and sold numerous insurance or "vehicle-protection products" to customers who purchased cars at the Dealerships.   Those product and service offerings include, *inter alia*, gap insurance, extended warranties, roadside assistance, and windshield repair services.

78.     The vehicle-protection products were, in some cases, underwritten and administered by third-party underwriters and administrators for and on behalf of "reinsurance" companies that are owned by Richard.  For example, Richard owned

Caribbean Reinsurance Ltd., and Archipelago Performance, Ltd., which offered the "reinsurance" products.

79.     The effect of the "reinsurance" structure is to effectively transfer the risk of loss associated with certain covered events from the customer to the dealership, which then transfers its risk of loss to the relevant third-party underwriter and administrator and, ultimately, the "reinsurance" company.

80.     When managed correctly, "reinsurance" products can not only give consumers peace of mind and provide them with additional services, such as an extended warranty on their vehicle, but also yield significant profit margins.

81.     After the Illegal Share Issuance, RNPs intentionally stopped the sale of, and refused to continue to sell, the numerous vehicle-protection products that were "reinsured" by Caribbean and Archipelago at the Dealerships—*i.e.*, they forcibly cut out Richard's businesses.

82.     Not surprisingly, after gaining control of the Dealerships with Chrysler's help, RNPs instead chose to sell vehicle-protection products offered by FCA US LLC.

83.     Defendants did so because of the ongoing Conspiracy with Defendant Chrysler and because the sale of Chrysler's vehicle-protection products at the Dealerships resulted in receipt of personal financial incentives from Chrysler.  The RNPs were also, at least in part, motivated by pure malicious intent to hurt Richard.

## VII. <u>CAUSES OF ACTION</u>

### COUNT ONE: BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

(With respect to both Dealerships)

84.    Plaintiffs incorporate by reference and reallege the preceding paragraphs as if set forth in full herein.

85.    Texas law expressly imposes the duty to act in good faith on parties to automobile dealer franchise agreements, and expressly makes a breach of that covenant "actionable in tort."[16]

86.    Chrysler failed to act in good faith by joining the Conspiracy and engaging in other tortious conduct as set forth above, which factually and proximately resulted in substantial damages exceeding $75,000. Accordingly, Chrysler is liable in tort for the damages resulting from its bad faith conduct.

### COUNT TWO: BREACH OF CONTRACT

(With respect to both Dealerships)

87.    Plaintiffs incorporate by reference and reallege the preceding paragraphs as if set forth in full herein.

---

[16] *See* TEX. OCC. CODE § 2301.478.

88.     Richard has standing to sue for breach of contract, even being a non-party, by virtue of his status as person essential to the contract (pursuant to Paragraph 2) and as a potential third-party beneficiary.

89.     Chrysler failed and refused to follow the terms of the Dealership contracts, which included the Motors and Dodge Sales and Service Agreements and the Additional Terms and Provisions as they pertain to both contract documents.

90.     Additionally, it appears likely that Chrysler failed to fully comply with prior discovery by virtue of their existing purported "approvals" for amendments to the two Sales and Service Agreements to replace Richard C. Poe with Gery A. Reckelbus as the dealer principal. Yet, despite the existence of such approvals and Gery Reckelbus' actual involvement with managing the Dealerships, Chrysler failed and refused to produce any copies of the updated Sales and Service Agreements listing Reckelbus as dealer principal.

91.     It is possible that, as a result of Chrysler's unlawful obfuscations, discovery abuse, and/or fraud, Plaintiffs do not possess current copies of the Sales and Service Agreements applicable to the Dealerships.

92.     In the alternative, it is also possible that the new agreements were never executed by Chrysler and, therefore, don't physically exist.

93.     Accordingly, Plaintiffs expressly reserve the right to amend this count in the future in order to seek relief for express and implied breach of possible oral

and implied contractual agreements, to seek related equitable relief, and to ask for such other and further relief as to which they may be entitled at law or in equity.

### COUNT THREE: TORTIOUS INTERFERENCE WITH DEALERSHIP SALES AND SERVICE AGREEMENTS and/or TORTIOUS BREACH OF CONTRACT

(With respect to both Dealerships)

94.    Plaintiffs incorporate by reference and reallege the preceding paragraphs as if set forth in full herein.

95.    Subject to, and without waiving the allegations set forth in Count Two above, Plaintiffs allege as follows.

96.    Plaintiffs' and Defendant's interests were subject to two Sales and Service Agreements pertaining to the Motors and Dodge Dealerships.

97.    Defendant willfully and intentionally committed one or more acts that tortiously interfered with said contracts, as set forth in detail above.

98.    Defendant's conduct factually and proximately caused actual damages to Plaintiffs in excess of $75,000.

99.    In addition, in the alternative, and without waiving the above, Defendant is also liable in tort because it joined an already ongoing Conspiracy, and thereby became responsible for the tortious acts that have already been committed by the other co-conspirators, which included Tortious Interference because conspirators are jointly and severally liable for each-other's tortious conduct.

100.   In addition, in the alternative, and without waiving the above, Defendant not only breached its contracts, but did so in a manner that was so egregious as to constitute an actionable "tortious" breach of contracts.[17]

## COUNT FOUR: TORTIOUS INTERFERENCE WITH PROSPECTIVE BUSINESS RELATIONSHIPS AND PROSPECTIVE ADVANTAGE

101.   Plaintiffs incorporate by reference and reallege the preceding paragraphs as if set forth in full herein.

102.   Chrysler's conduct tortiously interfered with the following business relationships:

- The relationship between Plaintiffs and PMI, by virtue of the Conspiracy and unlawfully allowing changes to PMI's management structure.

- The relationship between PMI and the limited partners of Dick Poe Motors, L.P. and Dick Poe Dodge, L.P. —by virtue of the Conspiracy and unlawfully allowing changes to PMI's management structure. Chrysler's tortious conduct involved removing Richard from management control over PMI, which adversely affected the Limited Partners' interests, and the Limited Partnerships as a whole.

---

[17] *See Boyles v. Thompson*, 585 S.W.2d 821, 836 (Tex. Civ. App. 1979) ("She did owe the commission by contract.  Her refusal to pay it was breach of contract; and the manner in which it was done made of it a tortious breach of contract.  Her participation with Boyles in his interference constituted additional tort.  She was liable to Thompson both in contract and in tort, though it makes no difference whether recovery from her be on the one theory or the other in this instance for the measure of Thompson's recovery is the same under either theory.").

- The relationship between Plaintiffs and prospective customers—including, but not limited to, car sales customers, services customers, and customers in the reinsurance sales context, where Chrysler gained an unfair business advantage as a result of its Tortious Interference and the Conspiracy, as set forth in more detail above.

103.   Chrysler's Tortious Interference as set forth above factually and proximately caused damages to Plaintiffs in excess of $75,000.

## COUNT FIVE: FRAUDULENT CONCEALMENT AND FRAUD BY NON-DISCLOSURE

104.   Plaintiffs incorporate by reference and reallege the preceding paragraphs as if set forth in full herein.

105.   At various times, Chrysler acted to fraudulently conceal information from Richard, including its involvement in, and actions in furtherance of, the Conspiracy.  This includes numerous failures to communicate with Richard, failures to return telephone calls or voice mails, failures to send written or electronic correspondence to Richard, and secretive actions such as replacement of management for the Dealerships without Richard's knowledge or consent.

106.   In the course of engaging in the above conduct, Defendant intentionally failed to disclose factual information to Plaintiffs.

107.   The facts that were not disclosed were material, as set forth in more detail above.

108.   Defendant had a duty to communicate with Plaintiffs that was required by law (*e.g.*, the statutory duty of good faith and fair dealing), by contract, by standard industry practice, and/or by Chrysler's internal policies.

109.   Plaintiffs relied on the nondisclosure to their detriment because the non-disclosure made it more difficult to discover the specific nature and extent of Defendant's wrongdoing.

## COUNT SIX: CONVERSION

110.   Plaintiffs incorporate by reference and reallege the preceding paragraphs as if set forth in full herein.

111.   Chrysler joined the Conspiracy as set forth above.

112.   The Conspiracy included unlawfully wrestling away dominion and control over PMI from Richard, which was done in part through the Illegal Share Issuance and in part with Chrysler's knowledge and active assistance with the unprecedented change in PMI's management structure and wrongful appointment of Reckelbus as the dealer principal, as set forth in detail above.

113.   The Conversion includes not only the illegally issued shares of PMI, but also the physical chattels owned by the Plaintiff Limited Partnership dealerships entities—ranging from dominion and control over the physical car inventory all the way to miscellaneous office supplies and other such chattels used by company employees.

4851-3317-2210.1

114.   The Relevant Non-Party Conspirators—Bock, Castro, Sergent, and Reckelbus—wrongfully exercised dominion and control over the above referenced personal property in a way that was inconsistent with Richard's rights.   In fact, Richard has been denied control over said property since 2015 and continues to be denied said dominion and control.   The Conspirators have refused all demands to return the property.

115.   Richard suffered extensive damages in excess of $75,000 by virtue of being denied access to the above property.

116.   By joining the ongoing Conspiracy, Chrysler became jointly and severally liable for the conduct of other co-conspirators, which includes their liability for the tort of Conversion.

## COUNT SEVEN: CIVIL CONSPIRACY

117.   Plaintiffs incorporate by reference and reallege the preceding paragraphs as if set forth in full herein.

118.   Defendant Chrysler combined with two or more persons—specifically, with the Relevant Non-Parties Bock, Castro, Sergent, and Reckelbus—to accomplish the unlawful purposes and engage in tortious conduct, including Tortious Interference, Breach of the Covenant of Good Faith and Fair Dealing, Conversion, and Fraud, as alleged above.

31

119.   Chrysler reached agreement and a meeting of the minds with the RNPs in order to accomplish the unlawful aims of the Conspiracy.

120.   As described above, Chrysler committed one or more unlawful overt acts in furtherance of the Conspiracy.

121.   As a result, Chrysler's, and the non-party co-conspirators' tortious conduct set forth above proximately caused substantial damages in excess of $75,000.

## VIII. DEMAND FOR JURY TRIAL

122.   Plaintiffs hereby demand a trial by jury on all issues of fact to which it is entitled to a jury trial in this action.

## IX. PRAYER FOR RELIEF

WHEREFORE, premises considered, Plaintiffs request judgment against Defendant Chrysler for the following relief:

- Monetary damages for actual damages as a result of Defendant's wrongful conduct in excess of $75,000, exclusive of interest and costs

- Exemplary and Punitive Damages as a result of Defendant's fraud and/or malice[18]

- Reasonable and necessary attorney's fees and costs incurred in connection with Defendant's breach of contract[19]

---

[18] *See* TX Civ. Prac. Rem. Code §41.002.

[19] *See* TX Civ. Prac. Rem. Code §38.001.

32

- Equitable relief, including restitution, as applicable, and

- Such other and further relief as to which Plaintiffs may be entitled at law or in equity.

Dated: July 19, 2021.

Respectfully submitted,

**BREWER, ATTORNEYS & COUNSELORS**
Attorneys for Plaintiffs

By: */s/ William A. Brewer, III*
William A. Brewer, III
*Admitted to ED Mich on* 4/17/1984
1717 Main Street, Suite 5900
Dallas, Texas 75201
Phone: (214) 653-4000
Fax: (214) 653-1015
wab@brewerattorneys.com

And Co-Counsel

**FOLEY & LARDNER LLP**
Attorneys for Plaintiffs

By: */s/ Jason Conti*
Jason Conti (P55617)
500 Woodward Avenue, Suite 2700
Detroit, Michigan 48226
Phone: (313) 234-7177
Fax: (313) 234-2800
jconti@foley.com